IN THE
# ARIZONA COURT OF APPEALS
## DIVISION ONE

THE VORTEX CORPORATION, an Arizona corporation,
*Plaintiff/Counterdefendant/Appellee,*

and

CODY RAMSEY and MARGARET RAMSEY, husband and wife; TED
LAMB and SHERENE LAMB, *Third-Party Defendants/Appellees*

*v.*

RAY P. DENKEWICZ and CAROL ANN DENKEWICZ, husband and
wife; ROLF ENGELHARD and LINDA ENGELHARD, husband and wife,
*Defendants/Counterclaimants/Third-Party Claimants//Appellants.*

No. 1 CA-CV 12-0269
FILED 09-16-2014

Appeal from the Superior Court in Yavapai County
No. P1300CV20080285
The Honorable Kenton D. Jones, Judge

**AFFIRMED**

COUNSEL

Gammage & Burnham, P.L.C., Phoenix
By Richard K. Mahrle
*Counsel for Plaintiff/Counterdefendant/Appellees and Third-Party Defendants*

Tiffany & Bosco, P.A., Phoenix
By Robert A. Royal, Aaron T. Lloyd
*Counsel for Defendants/Counterclaimants/Third-Party Claimants/Appellants*

## OPINION

Judge John C. Gemmill delivered the opinion of the Court, in which Presiding Judge Samuel A. Thumma and Judge Randall M. Howe joined.

**G E M M I L L,** Judge:

¶1        Ray and Carol Ann Denkewicz and Rolf and Linda Engelhard (collectively "Appellants") appeal portions of the judgment entered against them in favor of The Vortex Corporation ("Vortex"), Cody and Margaret Ramsey, and Ted and Sherene Lamb (collectively "Appellees").  For the following reasons, we affirm.

## BACKGROUND

¶2        Vortex was formed in 1993 by Appellant Rolf Engelhard.  As an inventor in the area of water purification technology, Engelhard envisioned Vortex as the corporate vehicle by which he could both generate income and fund his projects.  Appellees Lamb and Ramsey were introduced to Engelhard in 2003, and shortly thereafter, the three of them entered into business together.  Lamb and Ramsey had become majority shareholders in Vortex by 2005.

¶3        Appellant Ray Denkewicz was hired in September 2005 to serve as Chief Executive Officer of Vortex.  Soon after Denkewicz was hired, Rolf Engelhard was given the position of Chief Technology Officer of Vortex.  As part of their employment compensation, Denkewicz and Engelhard were to each receive "3% of the company's outstanding stock, in the form of stock grants, each year for 5 years, based on [their] performance."  After unsuccessful attempts to generate sales and develop manufacturing capabilities for their water purification products, Denkewicz and Engelhard were terminated as Vortex employees in September 2007.

¶4        Soon thereafter, Lamb and Ramsey formed a new business, Vortex Pure Water, LLC, which later changed its name to Zuvo, LLC (hereinafter "Zuvo"), in the hope of attracting new investors to what was previously the Vortex endeavor.  Lamb and Ramsey formed Zuvo to pay off Vortex's debt and reinvigorate the possibility of production and sales of the products previously in development.

**¶5**      Vortex sued Appellants in February 2008 for claims related to the return of corporate property and alleged violations by Denkewicz and Engelhard of their employment agreements with Vortex. Appellants counterclaimed, seeking stock in accordance with their employment agreements and alleging a series of other claims related to their terminated relationship with Vortex. Appellants' counterclaims alleging fraud, racketeering, and formation of a de facto corporate entity or partnership were dismissed on motion, but their remaining claims, along with Vortex's claims, proceeded to trial. The jury returned multiple verdicts, including:

- An award of a three percent stock interest in Vortex to Ray Denkewicz.
- An award of a three percent stock interest in Vortex to Rolf Engelhard.
- A determination that Appellants were not entitled to additional stock on the basis of a three-page document entitled "Proposed Vortex Operating Structure" — referred to by Appellants as the "VIP Agreement."
- Damages of $11,482.24 in favor of Vortex for its successful claims.
- Damages of $3,250 each for Ray Denkewicz and Rolf Engelhard for their successful claims.

**¶6**      Because the jury awarded Denkewicz and Engelhard each a three percent stock interest in Vortex, Appellants then asserted dissenter's rights regarding the transfer of Vortex's assets and liabilities to Zuvo. The trial court agreed that Appellants were entitled to dissenter's rights and instructed the parties to "engage in the statutory process" to determine fair value of the Appellants' stock. Vortex subsequently tendered approximately $2,000 to both Denkewicz and Engelhard, representing the fair value of a three percent stock holding, including interest. Appellants disagreed with Vortex's valuation, and Vortex requested a valuation hearing in accordance with Arizona Revised Statutes ("A.R.S.") section 10-1330 to determine the fair value of their shares at the time they were transferred from Vortex to Zuvo in August 2008.

**¶7**      At the valuation hearing, both sides presented expert testimony and evidence about Vortex's value. Appellants sought to establish that Vortex was worth somewhere between $15 million and $20 million. Appellees asserted Vortex was worth $61,682 at the time of the action to which Appellants dissented. The trial court ultimately adopted Appellees' valuation and awarded Denkewicz and Engelhard each

$2,054.85 for their respective three percent shares including interest. The trial court also awarded Appellees costs and attorneys' fees. Appellants timely appealed, and we have jurisdiction pursuant to A.R.S. §§ 12-120.21 and -2101(A)(1).

## ANALYSIS

### I.  Personal Jurisdiction Over Appellant Carol Ann Denkewicz

¶8          Appellants argue that the trial court abused its discretion by denying their Rule 60(c)(1) and (6) motion arguing that Appellant Carol Ann Denkewicz should not be subject to the judgment in this case because "her sole contact with [Arizona] is a contract that her husband entered with an Arizona corporation." We review the denial of a motion under Rule 60(c) for an abuse of discretion. *Searchtoppers.com, LLC v. TrustCash LLC*, 231 Ariz. 236, 241, ¶ 20, 293 P.3d 512, 517 (App. 2012).

¶9          Appellants rely on this court's opinion in *Sigmund v. Rea*, 226 Ariz. 373, 248 P.3d 703 (App. 2011), to argue that, because Rhode Island, where Carol Ann Denkewicz resides, does not recognize a "marital community," Carol Ann Denkewicz lacks the requisite minimum contacts for her to be subject to a judgment in Arizona. *Sigmund* dealt with whether "Arizona courts can exercise personal jurisdiction over residents [of another state] who have no contacts with Arizona apart from the unilateral business dealings of their spouses." *Id.* at 374, ¶ 1, 248 P.3d at 704. Ultimately, the *Sigmund* court held that personal jurisdiction cannot be exercised when one spouse's "unilateral actions cannot be attributed" to the other spouse and the couple does not reside in a state that recognizes the marital community. *Id.* at 377, ¶¶ 13–14, 248 P.3d at 706.

¶10          Although Appellants' legal analysis of *Sigmund* and Rhode Island's property law may be correct, Carol Ann Denkewicz consented to the jurisdiction of the Arizona courts by not asserting her personal jurisdiction defense until well after the conclusion of the major events of this litigation – the trial and the valuation hearing. In contrast, the spouses in *Sigmund* sought immediate relief from involvement in the Arizona proceeding by motions to dismiss. By allowing the claims against her to proceed until just before entry of judgment without objecting, Carol Ann Denkewicz waived her potential defense that she was merely a bystander caught up in her husband's unilateral actions. *See Nat'l Homes Corp. v. Totem Mobile Home Sales, Inc.*, 140 Ariz. 434, 438, 682 P.2d 439, 443 (App. 1984) (holding that "[w]e do not need here to determine when a 'timely'

application for ruling on the jurisdictional defense must be presented. Suffice it to say, that after a judgment on the merits has been entered, it is too late.").

**¶11**        On these facts, the trial court did not abuse its discretion in denying Appellants' Rule 60(c) motion regarding Carol Ann Denkewicz.

## II.    Appellants' Application for a Court-Ordered Advance of Litigation Expenses

**¶12**        Appellants argue the trial court erred in denying their application for an advance of litigation expenses pursuant to A.R.S. §§ 10-851, -853, -854, and -856. We review de novo the trial court's interpretation of these statutes. *See Bills v. Ariz. Prop. & Cas. Ins. Guar. Fund*, 194 Ariz. 488, 491, ¶ 6, 984 P.2d 574, 577 (App. 1999).

**¶13**        These statutes essentially allow a corporation to indemnify a corporate director or officer under certain conditions. *See* A.R.S. § 10-851. Additionally, "[a] corporation may pay for or reimburse the reasonable expenses incurred by a director who is a party to a proceeding in advance of final disposition of the proceeding" if certain conditions exist. A.R.S. § 10-853. Corporate officers may also be indemnified and advanced litigation expenses. A.R.S. § 10-856(A). Appellants primarily rely on § 10-856(A) to argue that, notwithstanding their status as *former* Vortex officers, Vortex should have provided an advance of expenses because Appellants "complied with all applicable statutory sections . . . as necessary to qualify for the advance of expenses."

**¶14**        Appellants admit that § 10-856(A) merely "permits" them "to receive the same protections afforded to directors under A.R.S. § 10-853." No provision of the statutes identified by Appellants *requires* a corporation to indemnify or provide an advance of litigation expenses to *current* directors or officers, much less former officers asserting claims against their former employer. *See* A.R.S. § 10-853(A) ("A corporation *may* pay for or reimburse") (emphasis added); A.R.S. § 10-854 ("On receipt of an application [for indemnification], the court after giving any notice the court considers necessary *may* order indemnification") (emphasis added); A.R.S.

§ 10-856 ("A corporation *may* indemnify and advance expenses") (emphasis added).[1]

**¶15**      The trial court did not err by denying Appellants' application for an advance of litigation expenses.

## III.    Dismissal of Appellants' Partnership Claim Under Rule 12(b)(6)

**¶16**      Appellants argue that the trial court erred in granting the Appellees' Rule 12(b)(6) motion to dismiss their counterclaim that alleged certain evidence showed the parties formed "a *de facto* LLC or partnership." On appeal, Appellants abandon arguments that a de facto limited liability company was established and focus exclusively on the alleged formation of a partnership.  As a result, we address only the dismissal of Appellants' partnership claim.  *See BAC Home Loans Servicing, LP v. Semper Invs., LLC.*, 230 Ariz. 587, 589 n.2, ¶ 3, 277 P.3d 784, 786 n.2 (App. 2012) (declining to address an issue on appeal that was initially raised but not argued in the opening brief).

**¶17**      Because dismissal on Rule 12(b)(6) grounds requires a finding that claimants are "not entitled to relief under any interpretation of the facts susceptible to proof," we review de novo the trial court's dismissal. *Coleman v. City of Mesa*, 230 Ariz. 352, 355–56, ¶¶ 7–8, 284 P.3d 863, 866–67 (2012) (internal citation omitted).  A court may only consider the pleading itself in adjudicating a Rule 12(b)(6) motion, although it may refer to "[a] complaint's exhibits, or public records regarding matters referenced in a complaint" without necessarily converting the Rule 12(b)(6) motion into a motion for summary judgment. *Coleman*, 230 Ariz. at 356, ¶ 9, 284 P.3d at 867.

**¶18**      In dismissing the partnership claim, the trial court found that Appellants had not pleaded a legally viable claim that a partnership existed between the parties.  The trial court noted that "every relevant factual

---

[1] Although A.R.S. § 10-852 provides for mandatory indemnification, it only applies when a director "was the prevailing party, on the merits or otherwise, in the defense of any proceeding to which the director was a party because the director is or was a director of the corporation[.]"  It may also apply if the director was acting as an "outside director" as determined by a court of competent jurisdiction in accordance with other well-defined statutory provisions.  Appellants make no argument, however, that § 10-852 applies here.

allegation" within the counterclaim "reflects the apparent intention of the principals to create something other than a partnership." Appellants argue that they pleaded sufficient facts to properly allege a claim under A.R.S. § 29-1012(A). They emphasize the final clause of subsection (A), which indicates a partnership can be formed "whether or not the persons intend to form a partnership," in arguing that sufficient facts were alleged to support allowing the claim to proceed beyond the pleading phase. They rely on the three-page VIP Agreement to establish their claim. Because the VIP Agreement was included as an exhibit in their counterclaim, the trial court was entitled to consider it and the other exhibits included with Appellants' counterclaim. *See Coleman*, 230 Ariz. at 356, ¶ 9, 284 P.3d at 867. At the time the VIP Agreement was drafted, Appellants and Appellees were already conducting business together through a corporate association, Vortex, and an LLC association, RCT Technologies, LLC. The VIP Agreement proposed the formation of VIP Holdings, LLC, which ultimately was not formed.

¶19        Subsections (A) and (B) of A.R.S. § 29-1012 provide:

> A. Except as otherwise provided in subsections B and C, the association of two or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership.

> B. An association formed under a statute other than this chapter, a predecessor statute or a comparable statute of another jurisdiction is not a partnership under this chapter.

This statue was enacted as part of Arizona's adoption in 1996 of the Revised Uniform Partnership Act. *See* A.R.S. §§ 29-1001 to -1111. In interpreting this statute, we focus on the statute's plain language as the most reliable indicator of its meaning. *See Powers v. Carpenter*, 203 Ariz. 116, 118, ¶ 9, 51 P.3d 338, 340 (2002). We conclude that because the parties were already working together through a corporate association and an LLC association, A.R.S. § 29-1012(A) does not apply to create a new association – specifically, a partnership – when the parties intended or attempted to change their business structure but did not express an intent to create a partnership. This interpretation is bolstered by comment 2 to section 202 of the Revised Uniform Partnership Act:

> [B]usiness associations organized under other statutes are not partnerships. Those statutory associations include

7

corporations, limited partnerships, and limited liability companies. That continues the [Uniform Partnership Act] concept that *general partnership is the residual form of for profit business association, existing only if another form does not*.

(Emphasis added.) Section 29-1012(A) may apply to create a partnership when the parties do not already have an established form of business entity or association. Subsection (B), which confirms essentially that corporations and LLCs are not partnerships under Arizona law, further supports our interpretation.

**¶20** Appellants' amended counterclaim alleges that the parties "negotiated and entered into [the VIP Agreement]" and that the agreement was "executed." Yet the VIP Agreement does not purport or propose to create a partnership. On the alleged facts, coupled with the language of the VIP Agreement itself and the interpretation of A.R.S. § 29-1012(A) explained above, the VIP Agreement did not create a new association in the form of a partnership but rather sought to modify the already existing business relationships between the parties. We agree with the trial court that the pleadings do not allege facts sufficient to find that a partnership was formed in accordance with A.R.S. § 29-1012. Accordingly, the partnership allegations were properly dismissed under Rule 12(b)(6).

## IV. Exercise of Dissenter's Rights and Corporate Valuation

**¶21** Appellants contend that the trial court incorrectly applied the fair value standard established in A.R.S. §§ 10-1330(E)(1) and -1301(4). The trial court's application of the dissenter's rights statutes is an issue of law that we review de novo. *See Blankenbaker v. Marks*, 231 Ariz. 575, 577, ¶ 6, 299 P.3d 747, 749 (App. 2013). In reviewing the trial court's valuation determination, we will abide by the trial court's factual findings unless they are clearly erroneous. *See Standage v. Standage*, 147 Ariz. 473, 481, 711 P.2d 612, 620 (App. 1985).

**¶22** After Appellants made a demand for payment pursuant to A.R.S. § 10-1328 and rejected an offer of payment based on a fair value determination by Vortex, and after the trial court determined that Appellants were entitled to exercise dissenter's rights, Vortex petitioned the trial court to hold a valuation hearing. Although Vortex initially argued that Appellants were not entitled to exercise dissenter's rights, on appeal neither party challenges the trial court's determination that the dissenter's rights statutes applied.

¶23     At the valuation hearing, Appellees sought to establish that at the time Vortex transferred its assets to Zuvo in August 2008 — the action to which Appellants dissented — Vortex was worth $61,682. This valuation was based on an assessment performed by Bruce Raben, an investment banker. Raben testified that he attempted "a variety of valuation methods" to determine Vortex's value. First, he used an "asset value" approach that looked exclusively at Vortex's balance sheet, showing assets and liabilities. Using this method, Raben found that Vortex's liabilities vastly outnumbered its assets, noting that the corporation was "insolvent" and had "no visible means of honoring its liabilities as they came due."

¶24     Second, Raben considered a "market value" approach that determined corporate value by comparing Vortex with other "comparable" corporations, either from the same industry or from comparable merger and acquisition activity. This method, according to Raben, was "problematic" in establishing value because Vortex had "no comparables . . . in public companies" and "no statistics to compare." When asked why Vortex's asset transfer to Zuvo was not sufficient to establish value under this method, Raben replied:

> [W]hat I call the Zuvo transaction involved a new [company] being created, capital being raised around a new management team, a new plan, and part of proceeds were used to buy assets from Vortex. But whatever valuation is implied by that transaction valuing Zuvo in my opinion was a bit of an artificial construct and not usable. And the reason, again in my opinion, is that all the capital that came in, came in from . . . friends and associates of the founders of the company . . . [T]he new company received the benefit of personal guarantees of the founders. Without those guarantees that transaction would not have happened, so I just didn't find it to be a third-party canceling transaction.

Raben went on to state that, in his professional opinion, the asset transfer between Vortex and Zuvo was not "an arm's length transaction between strangers," and because Vortex was not a "fundable operation," Raben determined that the market value approach either yielded a "value of zero" or that it was "non-applicable."

¶25     Finally, Raben conducted an "earnings approach" valuation (also known as a "Discounted Cash Flow" method ("DCF")), in which he

"created a projection that came up with a number for capital to do basically . . . a cold restart or relaunch of [Vortex] and then the projected performance of that [restart]." Raben's valuation report noted that, using a DCF method, a series of "highly favorable" pro forma projections result in a valuation of $61,682, which is "the average between a Discounted Cash Flow Model . . . and a Venture Model" that assumed different discount rates Raben considered reasonable. Relying on this valuation, Ray Denkewicz and Rolf Engelhard were each entitled to $2,054.85 in satisfaction of their respective three percent holdings (including accrued interest).

¶26         Appellants countered by presenting the testimony of John White, a certified public accountant and business appraisal consultant. In his analyses, White testified that he understood "the contribution agreement required that all the assets and liabilities of the Vortex Corporation be contributed to [Zuvo] and essentially continue to operate under the new entity name." As a result, throughout White's testimony, he repeatedly pointed to the Zuvo private placement memorandum as a source for his valuation analysis. White also testified that, among other methods, he also used a DCF analysis that:

> [B]egins with management's forecast of net income and discounts that back to the present value using a discount rate that I develop in my report. And those discounted values that are brought back to the present value are used to determine the value of invested capital from which I subtract at to arrive at equity.

White's report indicated that, in performing this analysis, he relied on "[t]wo sets of forecasts . . . presented in the [Zuvo] Private Placement Memorandum," one of which was "more consistent" with the forecasts that Miller Capital performed for Vortex in 2007. Ultimately, White concluded that "the fair value of a one hundred percent equity interest in the Vortex Corporation as of August the 11th, 2008, is $20,303,000.00."

¶27         The trial court adopted the Raben valuation, expressly finding that "the Vortex to Zuvo transfer of assets and liabilities cannot be considered an arm's length[] third-party transaction." Additionally, the court concluded that "[Appellants'] approach to 'fair value' does not comply with the legal standard for determining fair value in the context of dissenter's rights." The court further explained that "as between a determination that, on August 11, 2008, Vortex was worth $20,303,000.00 or $61,682.00, the Court is compelled to find the latter." The court concluded

that Appellees' payment of $2,054.85, respectively, to Ray Denkewicz and Rolf Engelhard represented payment in full of their stock interest in Vortex.

¶28          The question before us is whether the trial court erred in accepting the Raben valuation as establishing the fair value of Vortex stock at the time immediately before the transfer of assets to the new business. The statutes at issue require, in relevant part: "Each dissenter made a party to the proceeding is entitled to judgment . . . [f]or the amount, if any, by which the court finds the fair value of his shares plus interest exceeds the amount paid by the corporation."  A.R.S. § 10-1330(E)(1).  "'Fair value' with respect to a dissenter's shares means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion is inequitable."  A.R.S. § 10-1301(4).  In interpreting statutes, we start with the plain language of the statute. *New Sun Bus. Park, LLC v. Yuma County*, 221 Ariz. 43, 46, ¶ 12, 209 P.3d 179, 182 (App. 2009).

¶29          Only one Arizona case has previously interpreted these statutes. *See Pro Finish USA, Ltd. v. Johnson*, 204 Ariz. 257, 259–60, ¶¶ 4, 11, 63 P.3d 288, 290–91 (App. 2003).  In *Pro Finish*, the superior court received conflicting expert valuations of a corporation. *See id.* at ¶ 5.  The similarities to the instant case end there, however, because the competing valuations expressly concerned a third-party arm's length transaction, in which an outside buyer agreed to a purchase price for the corporation at issue. *See id.* at ¶ 3.  Thus, the *Pro Finish* court's conclusions regarding the factors a trial court may consider in making a valuation determination for a third party transaction provide guidance only to the extent that we rely on some of the same secondary sources that informed that decision. *See id. at* ¶¶ 12-13.  We therefore do not read *Pro Finish* as broadly as Appellants, who argue that *Pro Finish* compels us to view the transfer agreement between Vortex and Zuvo as the best evidence of Vortex's existing value.  Instead, we conclude that the evidence supports the trial court's finding that the Vortex-to-Zuvo asset transfer was not an arm's length transaction, which makes the instant case significantly different from *Pro Finish*.

¶30          *Pro Finish* favorably cited *Principles of Corporate Governance: Analysis and Recommendations* (1994) ("*Principles*"). *See id.* at ¶ 13.  Similarly, we have considered *Principles* to assist us in reviewing the trial court's determination of corporate value. *See AMERCO v. Shoen*, 184 Ariz. 150, 155, 907 P.2d 536, 541 (App. 1995) (relying on *Principles* as authoritative in a different context).  Section 7.22 of *Principles* provides, in relevant part:

(a) The fair value of shares under [corporate transactions giving rise to appraisal rights] should be the value of the eligible holder's proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability. Subject to Subsections (b) and (c), *fair value should be determined using the customary valuation concepts and techniques generally employed in the relevant securities and financial markets for similar businesses in the context of the transaction giving rise to appraisal.*

(Emphasis added.) *See also Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983) (holding that determining corporate value may be done by "includ[ing] proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court").

¶31 Both parties here cite a rule of law regarding corporate valuation in the exercise of dissenter's rights, established in other jurisdictions, that "fair value be determined by taking 'into account all relevant factors.'" *Weinberger*, 457 A.2d at 714 (citations omitted); *see also Matthew G. Norton Co. v. Smyth*, 51 P.3d 159, 163 (Wash. Ct. App. 2002) (authoritatively citing this rule in Washington); *Brown v. Arp & Hammond Hardware Co.*, 141 P.3d 673, 682 n.18 (Wyo. 2006) (applying this rule in Wyoming); *HMO-W Inc. v. SSM Health Care System*, 611 N.W.2d 250, 259 (Wis. 2000) (applying this rule in Wisconsin). This approach is essentially what Arizona courts have employed when performing valuations in different contexts. *See Mitchell v. Mitchell*, 152 Ariz. 317, 323, 732 P.2d 208, 214 (1987) (affirming in a family law context that trial courts must determine a business entity's value based on each case's facts and circumstances); *Kelsey v. Kelsey*, 186 Ariz. 49, 51, 918 P.2d 1067, 1069 (App. 1996) (asserting that "[t]he valuation of [business] assets is a factual determination that must be based on the facts and circumstances of each case."). We adopt this rule for Arizona in the context of dissenters' rights: fair value must be determined by taking into account all relevant factors.

¶32 To measure all relevant factors in this case, we note that *Principles* comments that fair value is determined by "customary valuation concepts." As one commentator observed about such concepts, "[t]he valuation technique used by a court is highly dependent on the valuation evidence presented by the parties. 'The parties, not the court, establish the record and the court is limited by the record created.'" Barry M.

Wertheimer, *The Shareholder's Appraisal Remedy & How Courts Determine Fair Value*, 47 Duke L.J. 613, 629 (1998) (quoting *Cede & Co. v. Technicolor, Inc.*, No. CIV.A.7129, 1990 WL 161084, at *8 (Oct. 19, 1990), *reversed on other grounds*, 684 A.2d 289 (Del. 1996)). Any review by a court of "all relevant factors" necessarily depends on the evidence presented at the fair value hearing.

¶**33** Although each party's expert analyzed valuation using multiple techniques, each expert's ultimate value determination was based on a form of DCF method (what Raben also called an "earnings approach"). It was from these respective DCF analyses that the trial court made its determination. Commentators have observed that DCF is "probably the most prominent and frequently used post-*Weinberger* method of appraisal." Wertheimer, 47 Duke L.J. at 628. In different legal contexts, Arizona courts have long recognized DCF as a viable valuation method. *See, e.g.*, *Pima County v. American Smelting & Refining Co.*, 115 Ariz. 175, 177, 564 P.2d 398, 400 (App. 1977); *Crystal Point Joint Venture v. Ariz. Dep't of Revenue*, 188 Ariz. 96, 101, 932 P.2d 1367, 1372 (App. 1997). Although the DCF method is by no means the *only* appropriate corporate valuation method, the trial court did not err by relying on the DCF method evidence presented at the valuation hearing on the record presented by the parties in this case. *See Maricopa County v. Barkley*, 168 Ariz. 234, 239, 812 P.2d 1052, 1057 (App. 1990) (holding that a trial court has discretion to qualify experts and rely on various methods in making a valuation determination).

¶**34** Appellants do not so much contest Raben's use of the DCF valuation method as they do the data he used to produce his fair value determination. Indeed, Appellants' own expert acknowledged that Raben had performed a DCF analysis with different data and projections. Appellants assert that the trial court erred in accepting the Raben DCF valuation because they believe Raben "failed to consider all factors [that] might reasonably factor into the fair value valuation." Appellants also contend that the trial court mistakenly "focused on the value of Vortex as a stand-alone entity" while "ignoring the value of the Vortex [a]ssets relied upon by Miller Capital and Mr. White." "Everyone knew," Appellants surmise, "that the fair value of Vortex was far greater than $61,682.00 prior to August 12, 2008." Thus, Appellants conclude that the investment of capital into Zuvo establishes that Vortex's assets, which were transferred into Zuvo, must have been worth more than indicated by the Raben valuation.

¶35          The inference that Appellants' seek to establish – that the projected value of Zuvo indicates greater value for Vortex – is undermined, however, because the action they believe illustrates Vortex's true value is the action to which they dissented. Appellants' expert testified that his DCF calculations relied upon the Zuvo private placement memorandum, which, in turn, had partially relied on the 2007 Miller Capital assessments. Appellants ask this court to view the transfer of assets from Vortex to Zuvo as nothing more than a continuation of Vortex under a new name. But this conclusion is unwarranted in light of the factual distinctions between the two entities. Zuvo was created with a new management team and new investors, wholly apart from Vortex. Zuvo's receipt of Vortex's assets and liabilities, though integral to Zuvo's potential future success, was only a component part of creating Zuvo and sustaining it.

¶36          Appellants emphasize the terms of the transfer between Zuvo and Vortex to argue that Vortex's value was clearly higher than Raben's valuation. In this sense, they seek to frame the transfer as an arm's length, third-party transaction. In such transactions, this court has observed that "[t]he common-sense answer to the question of an asset's value is what a third-party is willing to pay for it." *Pro Finish*, 204 Ariz. at 261, 63 P.3d at 292. But here, the trial court specifically found that the transfer of assets from Vortex to Zuvo was not an arm's length transaction, and this finding is fully supported by the evidence. *See Standage*, 147 Ariz. at 481, 711 P.2d at 620 (noting that a trial court's factual findings will not be set aside unless clearly erroneous). Thus, the concept of what a willing buyer would pay a willing seller is not applicable to the Vortex-to-Zuvo transfer.

¶37          The approach taken by the Supreme Court of Delaware in a slightly different context is helpful here:

> "The underlying assumption in an appraisal valuation is that the dissenting shareholders would be willing to maintain their investment position had the merger not occurred." Accordingly, the corporation must be valued as a going concern based upon the "operative reality" of the company as of the time of the merger.

*M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525 (Del. 1999) (citations omitted); *see also In re Marriage of Malloy*, 181 Ariz. 146, 151, 888 P.2d 1333, 1338 (App. 1994) (asserting that in determining the value of a partnership's assets, "valuation must be based on *realizable* benefits."). The "operative reality" of Vortex was wholly distinct and significantly less valuable apart from the impending transfer with Zuvo. Whatever value or benefit Zuvo

ultimately receives from the infusion of Vortex's assets and liabilities, the plain language of A.R.S § 10-1301(4) does not require the trial court to superimpose Zuvo's value after the transfer onto Vortex's value before the transfer. Indeed, A.R.S. § 10-1301(4) requires that a fair value determination focus on the value that exists "immediately before the effectuation" of the dissented-to corporate action, and therefore the value of Vortex as of August 11, 2008 had to be separated from whatever Zuvo would be worth on August 12, 2008, once the transfer of assets from Vortex had occurred.

**¶38** Although we review the trial court's legal conclusions de novo, once the trial court accepts the qualifications of any experts proffered by the parties and finds their valuation methods are supported by the evidence, the "ultimate selection of a valuation framework is within the [trial court's] discretion." *M.G. Bancorporation, Inc.*, 737 A.2d at 524; *see also Kelsey*, 186 Ariz. at 51, 918 P.2d at 1069 ("The valuation of [business] assets is a factual determination that must be based on the facts and circumstances of each case."). We conclude the trial court considered all the relevant factors based on the evidence presented; and we also conclude the evidence in this record sufficiently supports the trial court's reliance on the Raben valuation. We therefore affirm the trial court's findings and conclusions regarding the stock's fair value.

## V. Attorneys' Fees

**¶39** Appellants also argue that the trial court erred in awarding attorneys' fees to Appellees pursuant to A.R.S. § 12-341.01. The application of this statute to Appellees' claims is a question of statutory interpretation that we review de novo. *Ramsey Air Meds, LLC v. Cutter Aviation, Inc.*, 198 Ariz. 10, 13, ¶ 12, 6 P.3d 315, 318 (App. 2000). Appellants do not question the applicability of this statute, but they instead challenge the trial court's decision that Appellees were the "successful parties" and therefore eligible for an award of fees. Determining the prevailing party for the purposes of attorneys' fees is within the trial court's discretion and "will not be disturbed on appeal if any reasonable basis exists for it." *Berry v. 352 E. Virginia, LLC*, 228 Ariz. 9, 13, ¶ 21, 261 P.3d 784, 788 (App. 2011) (quoting *Sanborn v. Brooker & Wake Prop. Mgmt., Inc.*, 178 Ariz. 425, 430, 874 P.2d 982, 987 (App. 1994)). Likewise, the trial court has "broad discretion" to award and determine the amount of attorneys' fees under A.R.S. § 12-341.01(A). *Associated Indem. Corp. v. Warner*, 143 Ariz. 567, 570, 694 P.2d 1181, 1184 (1985). We will not disturb an award of attorneys' fees absent an abuse of discretion. *State Farm Mut. Auto. Ins. Co. v. Arrington*, 192 Ariz. 255, 261, ¶ 28, 963 P.2d 334, 340 (App. 1998).

**¶40**        Both sides in this litigation brought claims arising from their contractual relationships, and both prevailed on some of their claims, with damages awarded.  In fact, both sides sought large sums of money from the other and both fell significantly short of their financial goals in the litigation.  For cases involving claims and counterclaims in which both sides receive a favorable judgment in part, our supreme court has applied the "net judgment" approach, by which the "prevailing party" for attorneys' fees purposes is the party that, when both sides are awarded judgments, is awarded a greater amount than the other party.  *Ocean West Contractors, Inc. v. Halec Const. Co. Inc.*, 123 Ariz. 470, 473, 600 P.2d 1102, 1105 (1979); *but see Murphy Farrell Development, LLLP v. Sourant*, 229 Ariz. 124, 134, ¶ 36, 272 P.3d 355, 365 (App. 2012) (noting that trial courts "may use a 'percentage of success' factor or a 'totality of the litigation' rubric to determine which party prevailed" when the "net judgment rule" is inapplicable).  Because each side recovered less than the amounts sought, we conclude the net judgment rule is applicable.  *See Ocean West Contractors*, 123 Ariz. at 473, 600 P.2d at 1105.  Appellants received awards in their favor for a cumulative amount of $10,609.70 while Appellees received cumulative awards for $11,482.24, resulting in a "net judgment" in Appellees' favor of $872.54.  After reviewing this record and the arguments of the parties, we discern no abuse of discretion by the trial court in awarding attorneys' fees to Appellees.

## CONCLUSION

**¶41**        We affirm the trial court's judgment.  We deny Appellants' request for attorneys' fees on appeal.  Appellees request an award of attorneys' fees on appeal pursuant to A.R.S. § 12-341.01 and Arizona Rule of Civil Appellate Procedure ("ARCAP") 21.  In our discretion, we decline to award attorneys' fees to Appellees.  As the prevailing party on appeal, however, Appellees are entitled to an award of taxable costs on appeal upon compliance with ARCAP 21.



Ruth A. Willingham · Clerk of the Court
FILED: gsh