IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

THE WORLD EGG BANK, INC., *Plaintiff/Appellee/Cross-Appellant*,

*v.*

NESCO INVESTMENTS, LLC, *Defendant/Appellant/Cross-Appellee*.

No. 1 CA-CV 20-0027
FILED 5-18-2021

Appeal from the Superior Court in Maricopa County
No. CV2015-095504, CV2016-007439, CV2017-003792
The Honorable Christopher T. Whitten, Judge

**REVERSED AND VACATED IN PART; REMANDED**

COUNSEL

Anderson Banta Clarkson, PLLC, Mesa
By Adam C. Anderson

Gillette Blackhurst, PLC, Mesa
By Dennis Kent Blackhurst
*Co-Counsel for Plaintiff/Appellee/Cross-Appellant*

Ahwatukee Legal Office, PC, Phoenix
By David L. Abney
*Counsel for Defendant/Appellant/Cross-Appellee*

---

## OPINION

Chief Judge Peter B. Swann delivered the opinion of the court, in which Acting Presiding Judge Lawrence F. Winthrop and Judge Maurice Portley[1] joined.

---

**S W A N N**, Chief Judge:

**¶1**       Under A.R.S. §§ 10-1302(A)(3) and -1301(4), a shareholder may dissent from the sale of the corporation and receive payment for the "fair value" of the shareholder's shares "in the event of . . . [c]onsummation of [the] sale," with "fair value" determined as of the date "immediately before the effectuation of the corporate action to which the dissenter objects." We hold that the formation of a contract for sale of the corporation is, by itself, insufficient to constitute either consummation or effectuation of the sale. The sale must not be merely agreed to in order to trigger a dissenter's right to payment—it must actually occur.

**¶2**       Here, the individual who owned the majority shareholder of The World Egg Bank, Inc., ("TWEB") obtained authorization at a special shareholder meeting to sell TWEB to one of her affiliate entities. But though she claimed to have immediately agreed to the sale on behalf of both TWEB and the buyer, and though she later executed a written contract claiming that the sale closed and was effective as of the date of the special shareholder meeting, she provided no evidence that the sale actually was consummated or effectuated at that time. We therefore conclude that the superior court erred by ruling that the dissenting shareholder's shares were to be valued as of the date of the special shareholder meeting. Our conclusion requires us to reverse and vacate with respect to all rulings and portions of the judgment based on the erroneous valuation date, and to remand for further proceedings.

---

[1]       The Honorable Maurice Portley, Retired Judge of the Court of Appeals, Division One, has been authorized to sit in this matter pursuant to Article 6, Section 3 of the Arizona Constitution.

**FACTS AND PROCEDURAL HISTORY**

**¶3**        This appeal and cross-appeal arise from three consolidated cases with complicated factual and procedural histories. Only the following is material to the issues before us.

**¶4**        At the relevant time, Shari Weiss's entity Nesco Investments, LLC, owned 6.67% of the shares of TWEB, and Diana Thomas's entity DMCT, LLC, owned the remaining 93.33% of the shares.[2]

**¶5**        Thomas wanted to remove Weiss from TWEB. Accordingly, on April 2, 2015, she sent Weiss notice of an April 17, 2015, special shareholder meeting set for the purpose of considering and voting on proposals to immediately sell TWEB's assets and liabilities and dissolve the corporation. A letter accompanying the notice specified that Thomas anticipated majority approval of a sale to an affiliate of hers. Weiss understood that such a transaction was the plan.

**¶6**        On April 16, Weiss notified TWEB that she would not vote her shares in favor of the proposals and that she intended to demand payment for the fair value of her shares in the event of the proposals' effectuation. Before the meeting, TWEB provided Weiss with the written script that Thomas would use at the meeting to offer the proposals. Weiss approved the script and agreed not to attend the meeting. Thomas read the script at the meeting and voted DMCT's shares in favor of the proposals. Weiss's dissenting votes on behalf of Nesco's shares were recorded in her absence. The meeting resulted in the following resolutions:

> RESOLVED, that Diana Thomas, CEO of the Corporation, and sole owner of DMCT, LLC, the majority shareholder of the Corporation, is appointed the liquidation officer (the "Liquidation Officer") of the Corporation.
>
> RESOLVED, that the Liquidation Officer is authorized, in her sole discretion, to sell all or substantially all of the assets and liabilities of the Company (the "Assets and Liabilities") for a

---

[2]        The superior court determined the foregoing share allocation over Nesco's objection. But though Nesco asserts in passing on appeal that it owned more than 6.67% of the shares, it neither identifies nor develops the question of share allocation as an issue on appeal. We therefore deem waived any objection to the superior court's share-allocation determination. *See* ARCAP 13(a)(6)–(7); *Ritchie v. Krasner*, 221 Ariz. 288, 305, ¶ 62 (App. 2009).

cash price (the "Cash Price") equal to the fair market value of (i) the Corporation or (ii) all or substantially all of the assets and liabilities of the Corporation, as set forth in a valuation thereof, prepared by an independent Arizona CPA/CFF, CVA, selected by the Liquidation Officer and dated as of, or after, December 31, 2014 (the "Sale").

RESOLVED, the effective date of the Sale shall be determined by the Liquidation Officer, in her sole discretion, and may not be earlier than April 17, 2015, and not later than May 31, 2015.

RESOLVED, that the Liquidation Officer is authorized, in her sole and absolute discretion, to select and approve the buyer of the Assets and Liabilities (the "Buyer") provided the Buyer agrees to pay the Cash Price on or before May 31, 2015. To the extent that the Buyer, approved by the Liquidation Officer, is affiliated to any shareholder, the Cash Price may take into consideration the portion of cash proceeds otherwise distributable to such Buyer or its affiliate in liquidation of the Company.

RESOLVED, that the Sale shall be documented by a sale agreement approved by the Liquidation Officer, in her sole and absolute discretion, subject to compliance with the proposals voted on and approved by a majority of the shareholders on April 17, 2015 (the "Sale Agreement"), and the Liquidation Officer is authorized to execute the Sale Agreement on behalf of the Corporation, in her capacity as CEO of the Corporation.

RESOLVED, that the Liquidation Officer is authorized to make such additional changes to the Sale Agreement as she deems appropriate, in her sole and absolute discretion, other than a change to the Cash Price, to carryout [sic] and effectuate the Sale on or before May 31, 2015.

RESOLVED, that following the consummation of the Sale, the Corporation shall be dissolved no later than June 30, 2015.

RESOLVED, that the Liquidation Officer of the Corporation is authorized to perform all acts on behalf of the Corporation consistent with A.R.S. § 10-1405, *et seq.* required to dissolve the Corporation and liquidate the Corporation's assets.

> RESOLVED, that the Liquidation Officer is authorized to take all actions she deems necessary and appropriate in her sole discretion, consistent with the Proposals approved by the Shareholders at the Shareholders Meeting held on April 17, 2015, including the payment of costs and fees related to obtaining the valuation and finalizing the dissolution of the Corporation and the sale of the Corporation or all or substantially all of its assets and liabilities.

> RESOLVED, that the Liquidation Officer be authorized, in her sole and absolute discretion, to determine whether and when to file suit against Shari Weiss, and/or entities affiliated with Ms. Weiss, in connection with multiple alleged breaches of duties owed by Ms. Weiss and/or her entities to the Corporation.

¶7        Thomas testified that she had long known that the majority-affiliate buyer, as described in the April 2 letter, would be her solely owned company TWEB Resources, LLC.  Indeed, she had created the assetless TWEB Resources, which had no assets, the previous year in anticipation of the sale.  Accordingly, on the day of the special shareholder meeting, she agreed to the sale on behalf of TWEB and TWEB Resources, with a transition period and documentation to follow.  The next day, she "advise[d her] counsel to begin finishing up the documentation or anything that was needed to memorialize and formalize the transaction that occurred."  She also set up new bank accounts following the meeting.

¶8        But the sale did not immediately close.[3]  TWEB continued to control bank account and payroll operations, in the case of the latter until late 2016.  TWEB's name also continued to appear on marketing materials and contracts.

¶9        Thomas did not sign a written asset purchase agreement on behalf of TWEB and TWEB Resources until October 2015.  And she did not engage a Certified Business Valuator to determine the Cash Price (based on, consistent with the resolutions, a December 31, 2014, valuation) until later, on November 2, 2015 — though she understood that she "was going to have to pay whatever [the valuator's valuation] was."  Counsel made final changes to the written agreement on November 20, and the Certified

---

[3]        Thomas and counsel acknowledged the same in emails disclosed after the trial at issue here.

Business Valuator provided his valuation—$407,400—three days later. The record is devoid of evidence of a transfer of the Cash Price or assets, or of TWEB's dissolution. But the written agreement between TWEB and TWEB Resources nonetheless stated that the sale was made, closed, and effective as of April 17, 2015. The agreement further provided that TWEB would "maintain its bank accounts" and "serve as an escrow agent" for TWEB Resource's benefit, and that if TWEB "fail[ed] to transfer any of the Transferred Assets to [TWEB Resources], for any reason, then [TWEB] nevertheless [would] convey all economic benefits and burdens of ownership of the Transferred Assets to [TWEB Resources] and [would] act as [TWEB Resources]'s agent for ownership and possession of the Transferred Assets."

¶10 TWEB provided Nesco with a written dissenter's notice on December 11. Nesco thereafter submitted a written demand for payment of the fair value of its shares, and deposited its shares certificate. TWEB then gave Nesco a check representing its estimate of the fair value of Nesco's shares: $27,173.58 plus $1,330.58 in accrued interest. Nesco disputed that valuation, claiming it was entitled to at least $667,000 plus $32,660 in accrued interest. Nesco asked TWEB to commence an appraisal action to have the court determine fair value, and TWEB did so.

¶11 After a trial, the superior court defined the fair-value valuation date as April 17, 2015. In later proceedings, the court determined that TWEB's fair value as of April 17, 2015, was $457,000, and the court entered a judgment from which Nesco appeals and TWEB cross-appeals.

## DISCUSSION

¶12 Dissenting shareholders' rights are defined by statute in Arizona. *Pro Finish USA, Ltd. v. Johnson*, 204 Ariz. 257, 260, ¶ 8 (App. 2003). We review the superior court's application of the statutes de novo, abiding by its factual findings unless they are clearly erroneous. *Vortex Corp. v. Denkewicz*, 235 Ariz. 551, 557, ¶ 21 (App. 2014). "[T]he 'best and most reliable index of a statute's meaning is its language,' and where the language is plain and unambiguous, courts generally must follow the text as written." *Canon Sch. Dist. No. 50 v. W.E.S. Constr. Co.*, 177 Ariz. 526, 529 (1994) (citation omitted).

¶13 A shareholder may "dissent from and obtain payment of the fair value of the shareholder's shares in the event of . . . *[c]onsummation* of a sale or exchange of all or substantially all of the property of a corporation other than in the usual and regular course of business, if the shareholder is

entitled to vote on the sale or exchange, including a sale in dissolution." A.R.S. § 10-1302(A)(3) (emphasis added). "'Fair value' with respect to a dissenter's shares means the value of the shares immediately before the *effectuation* of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion is inequitable." A.R.S. § 10-1301(4) (emphasis added). Though the statutes do not define "consummation" or "effectuation," both words commonly connote accomplishment: to "consummate" means "[t]o bring to completion; . . . [t]o achieve; to fulfill[;] [t]o perfect; to carry to the highest degree," and to "effect" means "[t]o bring about; to make happen." Black's Law Dictionary (11th ed. 2019). Accordingly, applying the statutes' plain language, we conclude that when a shareholder dissents from the corporation's sale, the dissenter's rights are triggered by the occurrence of the sale—not by the entry of a contract for sale.[4]

**¶14** Conditioning a dissenter's right to payment on the occurrence of the contracted-for event makes sense. If the contract for sale is for some reason unperformed, then the dissenter's basis for dissociating from the corporation disappears. The dissenter does not lose its shareholder rights in such circumstances. *See* A.R.S. §§ 10-1323(B), -1324(B) (providing that dissenter retains shareholder rights "until these rights are canceled or modified by the taking of the proposed corporate action"); A.R.S. § 10-1326(A) (providing mechanism for return of dissenter's certificates or release of transfer restrictions "[i]f the corporation does not take the proposed action within sixty days after the date set for demanding payment"); *see also* 6 Arizona Practice, Corporate Practice § 8:15 ("The effective date of a corporate action is not always the same as the date of the shareholders' vote on that action. Because fair value is to be determined immediately before the effectuation of the corporate action, the statute ensures that shareholders are not stripped of their rights until the date the corporate action actually becomes effective."). Were that not the case, majority shareholders could easily, and unfairly, force out minority shareholders by merely feigning a sale—particularly in the case of a self-dealing sale. And to the extent that the announcement of a contract for sale might cause an increase in share value in the period before the sale's

---

[4] We have recognized the distinction between those two events in other contexts. *See Lockett v. Drake*, 43 Ariz. 357, 360 (1934) (stating general rule that real estate broker has fulfilled duties and earned commission once buyer and seller have entered binding contract, regardless whether contract ultimately is effected or consummated).

effectuation, § 10-1301(4) specifically forestalls any unfair sharing in that increase by shareholders who have decided not to participate in the sale.

¶15 Of course, the contracting parties may specify a retroactive effective date of sale. *See El Paso Nat. Gas Co. v. Ariz. Dep't of Revenue*, 174 Ariz. 470, 476 (App. 1992); *see also F.W. Leisure Indus. v. Cook Pain & Varnish Co.*, 153 Ariz. 342, 343–44 (App. 1987). But they cannot create an effective date dissociated from reality: they "may agree retroactively to alter their legal rights with respect to each other based on facts that have already occurred, but they cannot by agreement alter the nature of those past occurrences themselves." *El Paso Nat. Gas Co.*, 174 Ariz. at 476; *but see Oakridge Energy, Inc. v. Clifton*, 937 P.2d 130, 131, 134 (Utah 1997) (holding that when sale terms were announced on May 24 and sale was approved and closed on September 28 but made effective as of May 1, fair-value valuation date was pre-May). That rule is particularly important where, as here, the buyer and the seller are controlled by the same individual.

¶16 Here, the superior court established April 17, 2015, the date of the special shareholder meeting, as the fair-value valuation date.[5] But though the resolutions adopted at the April 17 meeting authorized Thomas to sell and dissolve TWEB, they did not themselves effect the sale or dissolution. And though Thomas testified that she entered the contract for sale (on behalf of both seller and buyer, in an unwritten agreement unchallenged under Arizona's statute of frauds, § 44-101) on April 17, and months later in the written agreement cited April 17 as the sale's effective and closing date, the court was provided no evidence that the sale was either "consummat[ed]" or "effectuated" under A.R.S. §§ 10-1302(A)(3) or -1301(A)(4) on April 17. Contrary to the resolutions' representation,

---

[5] We reject Nesco's contention that we should reverse because DMCT improperly voted at the special shareholder meeting. To be sure, the sale was a "director's conflicting interest transaction" under A.R.S. § 10-860(1)–(2) because Thomas owned both the majority shareholder and the buyer. Accordingly, under §§ 10-861(B)(2) and -863, Thomas was not entitled to vote DMCT's shares to authorize the sale—a fact that the superior court overlooked. But Nesco made no timely attempt to raise a challenge under § 10-861(B)(3) and (C), nor under § 10-1302(B). Indeed, before the May 2017 valuation-date trial, Nesco stated in an interrogatory response that it "ma[de] no allegations that the Special Meeting . . . was improperly conducted or improperly noticed," and Nesco reiterated that position in the joint pretrial statement. On this record, we must conclude that Nesco waived any challenge to DMCT's votes.

Thomas could not by fiat establish the effective or closing date. Consummation or effectuation had to be supported by evidence. Similarly, the written agreement's announcement of an agency relationship between TWEB and TWEB Resources was insufficient to support the theory that the sale closed on April 17—contracting parties cannot by agreement circumvent the reality that there has been no transfer of resources by simply claiming a retroactive agency arrangement. The earliest evidence of *any* sort of post-agreement progress toward sale post-dated April 17. Further, Thomas did not act on TWEB's statutory duty to provide the written dissenter's notice, which is triggered when "the corporate action is *taken*," A.R.S. § 10-1322(B) (emphasis added), until well after April 17.

¶17    In our view, none of the evidence presented at the May 2017 valuation-date trial established that the sale was ever consummated at all—on this record, it is unclear whether there was ever any performance under the contract. If there was no performance, then the appraisal action may be premature. At a minimum, however, the court clearly erred by assigning April 17, 2015, as the fair-value valuation date.

## CONCLUSION

¶18    Because the parties' experts and the court relied on an inaccurate date in determining fair value, we must vacate the fair-value award. We also must reverse all rulings and vacate all portions of the judgment dependent on the fair-value award, including those orders denying or awarding costs, fees, and sanctions.[6] We leave the balance of the judgment intact. We remand for future proceedings, including proceedings to determine when (if ever) the contracted-for sale actually occurred. We award no fees under A.R.S. § 10-1331(B). We award Nesco costs on appeal under A.R.S. § 12-341 upon compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED:    AA

---

6    In view of our conclusion that the court relied on an inaccurate valuation date, we do not address Nesco's challenge to the valuation or the parties' separate challenges to valuation-dependent rulings.