NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

NOLAN RYAN, et al., *Plaintiffs/Counter-Defendants/Appellees,*

*v.*

PAULINE A. HARRIS HENRY, et al., *Defendants/Counter-Claimants/Appellants,*

AMICABLE MANAGEMENT SERVICES LLC, *Intervenor/Appellee.*

No. 1 CA-CV 16-0217; 1 CA-CV 16-0601
(Consolidated)
FILED 1-18-2018

Appeal from the Superior Court in Maricopa County
No.  CV2013-015048
The Honorable Jo Lynn Gentry, Judge

**AFFIRMED**

COUNSEL

The Wilkins Law Firm, PLLC, Phoenix
By Amy M. Wilkins, Nancy R. Giles
*Co-Counsel for Defendants/Counter-Claimants/Appellants*

Osborn Maledon, PA, Phoenix
By Eric M. Fraser, Joshua D. Bendor, Thomas L. Hudson
*Co-Counsel for Plaintiffs/Counter-Defendants/Appellees*

Stoops Denious Wilson & Murray, PLC, Phoenix
By Frank L. Murray, Stephanie M. Wilson
*Co-Counsel for Intervenor/Appellee*

---

## MEMORANDUM DECISION

Presiding Judge James P. Beene delivered the decision of the Court, in which Judge Randall M. Howe and Judge Kent E. Cattani joined.

---

**B E E N E**, Judge:

**¶1**　　　Defendants Pauline Harris Henry ("Pauline") and George Henry ("George") (collectively the "Henrys") appeal the superior court's judgment following a jury trial in favor of Plaintiffs Nolan Ryan ("Nolan"), Mark Haile ("Mark"), and Tim Hammer ("Tim") (collectively "RHH"). For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**　　　This appeal involves a dispute about the proper members and directors of an Arizona non-profit entity. It concerns the five people listed above and one legal entity, Absolute Healthcare, Inc.

**¶3**　　　In 2010, Arizona voters passed the Arizona Medical Marijuana Act ("AMMA"). *See* Proposition 203 (2010); Ariz. Rev. Stat. ("A.R.S.") §§ 36-2801 to -2819. Pauline was interested in the Arizona medical marijuana business and discussed it with Mark. She learned that Mark and Tim had invested in a Colorado medical marijuana dispensary operated by M.P. When M.P. decided to expand to Arizona, Pauline invested $500,000 for the specific purpose of opening an Arizona dispensary. After M.P. allegedly unilaterally modified the agreement, Pauline, Mark, and Tim decided to go into business together in Arizona without M.P. Starting an Arizona medical marijuana business would also allow Pauline to recoup losses from her investment with M.P.

**¶4**　　　In furtherance of their business endeavor and to avoid the same problem they experienced with M.P., in February 2011, Pauline drafted a joint venture agreement ("JV Agreement") and presented it to the

group to sign. The JV Agreement stated that Pauline, George, Mark, and Tim were "entering into a Medical Marijuana business venture together" and agreed on several terms, including that "[e]ach person will have equal shares in the business, (33 1/3%), and all profits, mon[ies], etc., will always be distributed equally." The Henrys together held a one-third interest. The JV Agreement, as drafted by Pauline, also provided that her daughter, Rhonda Slater, and son, Roger Harris, were to be given positions managing the dispensary and cultivation/grow facility. The record is unclear why only Mark and George signed the JV Agreement at that time.

¶5           The group planned to open two dispensaries in Arizona. For the first, in March 2011, they executed Articles of Incorporation ("Articles") for a non-profit entity called Absolute Healthcare Solutions ("Absolute"), which later became the dispensary opened in Gilbert. The Articles listed Mark, Pauline, and Michelle Hammer (Tim's wife) as directors and stated that Absolute "shall not have a membership." Shortly thereafter, in mid-April 2011, the group received communication from M.P., wherein he accused Mark and Tim of stealing his business idea. Because of the group's concern that M.P. might sue once he learned of their business plans, it was decided to amend Absolute's Articles to remove any reference to Mark and Tim.

¶6           Mark, Tim, and Pauline then sought legal assistance from attorney Christine Forakis to assist them in completing the dispensary applications to the state. In May 2011, at the group's direction, Forakis replaced the previous Articles for Absolute, removing any reference to Mark and Tim and adopting a new name (Absolute Healthcare Facilities, Inc.). They later shortened the name to Absolute Healthcare, Inc. In pertinent part, the Articles stated that the initial board of directors consisted of the Henrys only and that they would serve "until the first annual meeting of the members, if a member corporation, or Board of Directors, if the corporation has no members, or until their successors are elected and qualifies[.]" The Articles stated that Absolute "shall have members" and that the directors "shall have the power to provide in the Bylaws guidelines for membership" including the manner of selection and voting rights. The group subsequently executed Bylaws for Absolute, stating, in contrast to the Articles, that Absolute "shall have no members."

¶7           From May 2011 to January 2012, due to pending litigation, Arizona's medical marijuana program was suspended. In February 2012, once the group was free to proceed, Pauline, George, Mark, and Tim signed a new draft of the original JV Agreement (same terms as in February 2011), and Mark, Tim, and Pauline signed attorney Forakis' fee agreement and

dual representation disclaimer forms. They submitted Absolute's dispensary application to the state, listing Mark, Tim, Pauline, and George as employees. In April 2012, the group formed another non-profit entity called Perpetual Healthcare, Inc. ("Perpetual") that later opened in Wellton as the group's second dispensary. The public filings for Perpetual listed Mark, Tim, and Pauline as directors.

¶8            Soon after, Pauline introduced Nolan to the group because he had experience in cultivating marijuana and had capital to invest. Because Nolan joined the group later, he had not signed the JV Agreement and was not included on the Articles of either Absolute or Perpetual. The parties agreed, however, that Nolan would be the "fourth partner" and the group would split everything equally. In February 2013, the group formed a for-profit entity to manage Absolute and Perpetual called PNTM Management Services, LLC ("PNTM"). PNTM stood for Pauline, Nolan, Tim, and Mark.

¶9            By mid-May 2013 however, the group began having disputes about various issues, including voting rights and the capital investments each made to the business. Given these disagreements, the group's effort to execute an operating agreement for PNTM failed. In early June 2013, in an attempt to resolve the group's concerns, they executed promissory notes from Absolute, PNTM, and Perpetual and a conflict of interest policy reaffirming their commitment to each other and the venture. The group agreed that instead of receiving profit sharing/distributions in repayment of their investments, each would receive membership interests in PNTM. That membership percentage in PNTM would then determine the manner of distributions. Pauline agreed to reduce the repayment of her original $500,000 investment to $300,000 in exchange for a 42.5% membership interest. Nolan received a 37.5% interest, and Mark and Tim each received a 10% interest. In essence, execution of the promissory notes changed the split of profits each would receive from PNTM.

¶10            For the next several months, the group proceeded with their venture, including holding "board meetings" in advance of the opening of Absolute in Gilbert. But by September 2013, the group experienced additional difficulties and began discussing a possible split. When RHH requested an accounting for Absolute and PNTM from Pauline in her role as the group's "CFO," she refused and said they were "strangers to the business." The group participated in an informal mediation, but it was unsuccessful. In response, in October 2013, RHH sent the Henrys a demand letter. The Henrys responded by stating that they were "the only board members of Absolute" and had called the police to ensure "that nobody trespasses on Absolute's property."

¶11            In November 2013, RHH filed suit against the Henrys seeking (1) injunctive relief as to the relationship between Absolute and PNTM and a finding that PNTM was Absolute's management provider, (2) declaratory judgment that RHH were the co-owners of PNTM and members of Absolute, and (3) an accounting of the entities.  The Henrys answered and counterclaimed for (1) declaratory judgment regarding the control of Absolute and PNTM, (2) accounting of Absolute and PNTM, (3) breach of fiduciary duty, (4) fraud, (5) unjust enrichment, (6) conversion, (7) aiding and abetting, (8) consumer fraud, (9) securities fraud, and (10) conspiracy.

¶12            In January 2014, the superior court granted RHH's preliminary injunction and appointed a receiver for Absolute and PNTM. The receiver then appointed Mark, Tim, and Nolan to oversee business operations for Absolute and PNTM during litigation.   The parties eventually agreed (1) to dismiss most of the Henrys' counterclaims (counterclaim counts 4-10), and stipulated that RHH would be the prevailing parties on those counterclaims and could apply for attorneys' fees, costs, and sanctions; (2) to dismiss the Henrys' breach of fiduciary duty claim (counterclaim count 3); and (3) that the accounting claims of both parties were moot (count 3 and counterclaim count 2).

¶13            Pursuant to the stipulated order and joint pretrial statement, the only remaining contested issues for the jury were declaratory judgment regarding (1) the identity of the members of Absolute's board of directors, (2) the identity of the members of Absolute, and (3) whether PNTM was the exclusive management services provider for Absolute.

¶14            After an eight-day jury trial in August and September 2015, the jury found that (1) PNTM was the exclusive management services provider for Absolute; (2) Absolute's board of directors consisted of Tim, Nolan, Mark, Pauline, and George; and (3) Absolute's members were Tim, Nolan, Mark, Pauline, and George.  Final Judgment was entered in June 2016, and the court awarded RHH attorneys' fees and costs, plus interest, in the amount of $651,454.51.   The Henrys unsuccessfully moved for judgment as a matter of law and for a new trial under Arizona Rules of Civil Procedure 50(b) and 59(a)(8).[1]

---

[1]         We cite to the procedural rules in effect at the time of trial in 2015.

¶15        The Henrys timely appealed.  We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1) and -2101(A)(1).

## DISCUSSION

### I.    Standard of Review

¶16        We review the denial of a motion for new trial based on the verdict being against the weight of evidence for an abuse of discretion.[2] *Dawson v. Withycombe*, 216 Ariz. 84, 95, ¶ 25 (App. 2007).  And in reviewing a jury verdict, we view the evidence in the light most favorable to sustaining the verdict and will affirm if substantial evidence supports the verdict. *Warrington v. Tempe Elementary Sch. Dist. No. 3*, 197 Ariz. 68, 69, ¶ 4 (1999).  Substantial evidence is proof that permits reasonable persons to reach the jury's result.  *In re Estate of Pouser*, 193 Ariz. 574, 579, ¶ 13 (1999).

### II.    Absolute's Membership and Board of Directors

¶17        The Henrys argue that the superior court erred in entering judgment that the parties' JV Agreement determined the board composition and membership of Absolute, a medical marijuana non-profit, because governance of a non-profit is controlled by statute and the jury's verdict adding additional members and directors to Absolute is contrary to law.[3]

---

[2]        The Henrys argue that the superior court erred in denying their motion for judgment as a matter of law ("JMOL").  Because the Henrys failed to properly present a JMOL before the superior court, except for one narrow argument related to shared losses, we deem it waived and do not address it.  *See Trantor v. Fredrikson*, 179 Ariz. 299, 300 (1994) ("Because a trial court and opposing counsel should be afforded the opportunity to correct any asserted defects before error may be raised on appeal, absent extraordinary circumstances, errors not raised in the trial court cannot be raised on appeal."); *Englert v. Carondelet Health Network*, 199 Ariz. 21, 26, ¶ 13 (App. 2000) ("we generally do not consider issues . . . raised for the first time on appeal").  As for the Henrys' preserved argument that the group did not agree to share losses, and, thus, RHH failed to establish a joint venture, we discuss it *supra* ¶¶ 40-47.

[3]        The Henrys argue that the superior court erred in finding that the parties' JV Agreement controlled Absolute's membership and board of directors because no evidence indicated that Absolute submitted additional

Specifically, the Henrys contend that Absolute's Articles listed only them as the initial board of directors, additional directors must be added pursuant to A.R.S. § 10-3804, and the Bylaws state that it will not have members. Thus, because the Henrys did not elect Mark, Tim, and Nolan as directors and no evidence indicated the Bylaws were amended to allow for membership, the jury verdicts naming Mark, Tim, and Nolan as directors and members are contrary to law. We disagree.

**¶18**        Among other things, a corporation's articles of incorporation must set forth the initial board of directors and whether it will have members. *See* A.R.S. § 10-3202(a)(6), (7). A corporation's bylaws "may contain any provision . . . that is not inconsistent with . . . the articles of incorporation." A.R.S. § 10-3206(B). Additional directors may be added pursuant to A.R.S. § 10-3804 as follows:

> A. If the corporation has members, the members shall elect all the directors except the initial directors at the first annual meeting of members, and at each annual meeting after the first annual meeting[.]

> B. If the corporation does not have members, all the directors except the initial directors shall be elected, appointed or designated as provided in the articles of incorporation or

---

names of directors in its dispensary renewal certificate to the state under the Arizona Administrative Code. Because the Henrys failed to raise this argument before the superior court, however, we deem it waived and do not address it. *See Trantor*, 179 Ariz. at 300; *Englert*, 199 Ariz. at 26, ¶ 13. Moreover, the Henrys fail to cite any authority for the proposition that the reporting requirements for medical marijuana dispensaries under the Arizona Administrative Code control the governance of a non-profit legal entity. As such, we deem it waived. *See* ARCAP 13(a)(7)(A) (stating that the opening brief must include an "[a]ppellant's contentions concerning each issue presented for review, with supporting reasons for each contention, and with citations of legal authorities and appropriate references to the portions of the record on which the appellant relies").

Also, in their opening brief, the Henrys argue that the superior court erred in (1) entering judgment that PNTM was the exclusive management services provider for Absolute because the arrangement is illegal under Arizona law; and (2) approving the receiver's final report, accountings, and tax returns. Because both issues have been dismissed on appeal by the parties, we do not address them.

bylaws. If no method of designation or appointment is set forth in the articles of incorporation or bylaws, the board of directors shall elect the directors other than the initial directors.

**¶19** Here, the Henrys were listed as the initial directors on Absolute's Articles. The Articles stated that Absolute "shall have members," whereas the Bylaws stated it "shall have no members." When the Articles and Bylaws conflict, the Articles control. *See* A.R.S. § 10-3206(B). Thus, Absolute has members, and, under § 10-3804(A), those members elect the directors.

**¶20** The primary issue at trial was whether the parties had an enforceable contract — RHH alleged that the parties entered a binding JV Agreement to operate a medical marijuana business, whereas the Henrys alleged that no enforceable agreement existed and, even if it did, RHH forfeited any such rights when they abandoned the business. The parties agreed, both in the stipulated order/joint pretrial statement and jury verdict forms, that based on whether they entered into an enforceable contract, the jury would have to specifically identify Absolute's members and directors.

**¶21** Whether a contract exists, including whether the parties had a meeting of the minds and intended to be obligated, is "to be determined in case of doubt, not only from the words used, but also from the situation, acts and conduct of the parties, and from the attendant circumstances." *Malcoff v. Coyier*, 14 Ariz. App. 524, 526 (1971); *see also Schade v. Diethrich*, 158 Ariz. 1, 9 (1988) ("ultimate element of contract formation—the question whether the parties manifested assent or intent to be bound."). A written agreement is not required where one party has undertaken acts in reliance on and consistent with the agreement. *Owens v. M.E. Schepp Ltd. P'ship*, 218 Ariz. 222, 226, ¶¶ 15-16 (2008). Such acts establish the existence of a contract "only if they cannot be explained in the absence of the contract." *Id.* at ¶ 16.

**¶22** "A joint venture is formed when two or more parties agree to pursue a particular enterprise in the hope of sharing a profit." *Ellingson v. Sloan*, 22 Ariz. App. 383, 386 (1974). "There are five specific elements which must be present in order to establish a joint venture: (1) a contract, (2) a common purpose, (3) a community of interest, (4) an equal right of control and (5) participation in both profits and losses." *Id.* "A contract of joint venture may be express or implied . . . [and] is founded upon a mutual understanding between the parties that they will associate themselves in a

particular venture, and their intent to do so may be inferred from their conduct." *Id*. at 387.

¶23        Over eight days, the jury heard extensive testimony from eight witnesses and 368 exhibits were received into evidence.

### A. Tim's Testimony

¶24        Tim testified that the group formed a partnership when they first decided to move forward with the medical marijuana business after the M.P. agreement ended. Additionally, Tim understood that when Pauline drafted the JV Agreement, she wanted to make clear that her intent was for the group to have equal partnership shares from that day forward. At no time did Pauline place conditions or restrictions on that business relationship. Tim testified that he and Mark together initially invested approximately $150,000, and while Arizona's medical marijuana program was suspended, the group used that money to pay rent and utilities at the Absolute and Perpetual locations to preserve those sites with the cities. He admitted that from November 2012, the group did not invest equal amounts into the business. However, the disparate contributions only changed the percentage everyone would receive in PNTM profits, as evidenced by the promissory notes. It did not, in Tim's view, change their original agreement to be equal partners in all the companies.

¶25        With respect to his name's removal from Absolute's Articles, Tim testified that he and Mark became concerned after receiving communications from M.P. threatening litigation. Thus, it was recommended that the group remove them from the Articles. But the fact that the Henrys were listed as the only directors did not change the group's partnership agreement of equal splits. When asked why they kept their names off the Absolute filings, but included them on the Perpetual filings, Tim explained that Absolute was to be in Gilbert, a desirable location, whereas Perpetual was to be in Wellton, a less desirable location, viewing it as a "sacrificial lamb" if M.P. tried to interfere. Tim reiterated this still did not change the equal 1/3 joint venture partnership, stating they "were partners on all the entities. So it didn't matter who was on what . . . We verbalized it. We talked about it several times. So we were partners. We were always partners." Tim denied the need to have a side agreement with Pauline documenting that he and Tim would be added back on Absolute's Articles after it opened "[b]ecause we trusted Pauline. I mean, we were all partners" operating on "devotion, money, contributions, everything that the four of us had put together to move the business to the next level."

¶26          Tim testified the relationship with Pauline began to deteriorate a few weeks after Absolute opened.  He, Mark, and Nolan worried that Pauline's children (Rhonda and Roger) did not have the experience or skills necessary to carry out their roles as dispensary and cultivation managers.  When they discussed it with Pauline, "all hell broke loose."  She became angry and told them that Roger would be the cultivation manager, "[i]t's my building and that's it."

## B.  Mark's Testimony

¶27          Mark testified that before the group could form legal entities or submit dispensary applications, the state required applicants to secure physical site locations.  In that effort, before the group formed Absolute, Mark negotiated the real property leases and paid the security deposits.  While the medical marijuana program was suspended, Mark said they continued to pay rent on the real property locations and, by October 2011, he had invested $140,000 to keep the venture running.  During that delay, Mark testified he stayed in constant communication with Pauline, and believed they were still in a partnership relationship/business venture together because they all behaved like they were still partners.  Mark said he interpreted the JV Agreement to mean that "we were all partners.  We were all married.  We were all going to go through the challenge of getting to the end of the line together."

¶28          After receiving communication from M.P. accusing them of stealing his business idea, Mark said he did not want to use the original Absolute Solutions entity for the dispensary application because his and Tim's names were listed, and he was concerned about M.P.'s "vicious ways that . . . would create some sort of turmoil somewhere that would either get an application slid to the side or otherwise."  When the group met to discuss M.P. and the next step, everyone agreed to remove Mark and Tim's names from the Articles.  Mark controlled the lease to the Gilbert facility location, but he agreed to have Absolute tied to that location even though only the Henrys were listed on the Articles because he "100 percent trusted the fact that we were partners.  We were partners in every aspect of this entire endeavor."  Mark testified that if Pauline had said that he and Tim were not on Absolute's board and would never be, he would have acted differently.  He would have directed that Perpetual be designated the dispensary tied to the Gilbert location because he was on Perpetual's filings and Gilbert would be more lucrative as more medical marijuana patients lived in that area.  Moreover, Mark testified he would not have devoted all the effort into getting Absolute up and running in Gilbert if he was not on the board.

¶29 Mark confirmed that when Nolan joined the group, they all agreed that he would be the fourth partner. This meant that each partner would receive 25% of "whatever the business was, whatever it was going to be, however many entities attached to it, we were all going to be partners and owners and decision makers." Mark testified that Pauline and Nolan started having friction over Nolan's concerns about Pauline's son (Roger) and his ability to run the cultivation facility. When the group discussed Nolan's concerns, Pauline became upset, and it created a problem within the group. Mark testified that at the group's informal mediation in September 2013, he learned that Pauline had previously retained counsel. Mark said he felt "strung along" because he had been working to finish building the business while Pauline had already retained counsel. Mark testified they were asking to be added to Absolute as directors and members because "[t]hat was our agreement . . . [t]hat was our commitment to each other. That was the whole purpose of all the work and effort and the time."

### C. Nolan's Testimony

¶30 Nolan testified that he met Pauline through her son, Roger. Roger was interested in the medical marijuana business and began working at Nolan's cultivation/grow facility. Nolan testified that Pauline also wanted Roger to learn about cultivation to become a grower and manage a grow facility. Nolan and Pauline agreed to each pay half of Roger's salary. Nolan confirmed that when he joined the group, he became the fourth partner, meaning he was a member and a director of Absolute. He denied Pauline's claim that he was required to meet certain conditions in order to be added as a member and director of Absolute. Nolan testified by the time Absolute opened, he had invested $450,000. Nolan believed the breakdown with Pauline occurred when he expressed concerns about Pauline's children and their capabilities as dispensary and cultivation managers. Nolan said Pauline told him she was worried that if Roger was not the first employee at the cultivation facility, Roger would no longer speak to her and she could not afford this to impact her relationship with Roger.

### D. Pauline's Testimony

¶31 In contrast, Pauline testified that Nolan, Mark, and Tim were never partners with her and George, but, they all were "members together." She denied having a joint venture partnership with them for any entity, and denied ever having "board meetings" with them for Absolute. Pauline explained those meetings were for PNTM only. Pauline testified that she insisted that Nolan, Mark, and Tim not be on Absolute's board of directors

and would not have moved forward with this endeavor if they were board members. She explained that she had lost a lot of money in the deal with M.P. and "needed some security." Pauline stated she told Nolan, Mark, and Tim that she would only consider putting them on the board if she was repaid her $500,000. She said she told Nolan that if he ceased operating his own medical marijuana cultivation facility/caregiving business, she would consider adding him to Absolute's board, but he never met those conditions; and the first time she heard Mark, Tim, and Nolan demanding to be on Absolute's board was in their attorney's demand letter in October 2013. Pauline admitted that for her $500,000 investment in M.P.'s Colorado dispensary, she owns 2.5% of his company, but had yet to inquire about the status of M.P.'s operation.

¶32 Pauline admitted that she allowed Mark and Tim to decide whether to keep their names listed on Absolute's Articles, but denied she was ever told that they were concerned that M.P. would interfere in their business plan. She also stated that the group was not discussing taking Mark and Tim off the Articles because of M.P. Pauline said the idea that Mark and Tim were listed on Perpetual's filings and not Absolute's because Gilbert was more lucrative is "not only ridiculous, it really doesn't even calculate." Pauline testified that Mark and Tim were listed as Perpetual's initial board of directors and subsequently added her to the board. She explained that she originally was not intended to be on Perpetual's board, but when the group applied for the dispensary license, they needed to show financial backing of $150,000 and she was only one with sufficient capital. Pauline admitted that Mark and Tim could have removed her from Perpetual's board by a vote of 2-to-1, but did not. In fact, she was asked to attend Perpetual's board meeting, but when she demanded that she be allowed to bring her attorney and a court reporter, the invitation was rescinded.

¶33 Pauline testified that in November 2012, Mark and Tim advised her they were unable to continue to contribute or invest in the endeavor. At that point, Pauline said the original business venture agreement changed; she could no longer split profits evenly because Mark and Tim "dumped everything on me" and broke their agreement "in so many ways it was amazing." Pauline said that after the informal mediation in late 2013 failed, Mark, Tim, and Nolan did not return to work and left her to run the business. She denied telling Mark, Tim, and Nolan that they could not come back to work.

¶34 Pauline testified that she originally agreed to invest $1 million in M.P.'s Colorado endeavor "to get a nice job" for herself, her son, and her

daughter, and admitted incorporating jobs for her children into the JV Agreement because that was something she wanted as part of the venture with Mark and Tim. In fact, Pauline's daughter (Rhonda Slater) and her son (Roger Harris) were listed on Absolute's dispensary application to the state and received positions at the dispensary when it opened. Although Rhonda received a job as intended pursuant to the JV Agreement, Roger did not because Mark, Tim, and Nolan hired someone with more experience to manage the cultivation facility. Pauline admitted to hiring someone to help her son fulfill his role in the cultivation facility, but denied that Mark, Tim, and Nolan concurrently had concerns about Roger's competence. She also denied that her conflicts with the group stemmed from her fear that her children would lose their jobs. Pauline admitted that in early 2014 (after RHH's lawsuit was filed but before the injunction was granted), she and George held a board meeting for Absolute. The only business conducted was to add Pauline's children and other family members to Absolute's board. The Henrys held no other Absolute board meetings.

### E. George's Testimony

¶35        George testified that when the group first decided to start a medical marijuana business and Pauline drafted the JV Agreement in February 2011, it was agreed to proceed with the business, including Absolute, as partners. The partnership formed as of February 2011, included Mark, Tim, Pauline, and George. Additionally, George confirmed that when Pauline brought Nolan into the partnership, it was agreed Nolan would be the fourth partner and he, Pauline, Mark, Tim, and Nolan were equal partners with equal rights in Absolute, Perpetual, and PNTM. Despite being equal partners with equal rights, George testified that he never agreed that Mark, Tim, and Nolan were to be members or directors of Absolute, and only discussed adding them "if certain things had happened." George stated he and Pauline eventually added family members to Absolute's board of directors. He testified that the original agreement to be equal partners ceased in June 2013 when Mark, Tim, and Nolan had no more money to invest in the venture and the group executed the promissory notes. George admitted, however, that personally he was "not involved hardly at all" in this business enterprise, had no personal knowledge of what was discussed at the various meetings, having attended only one or two meetings with Mark and Tim in 2011, and his understanding about the venture was an assumption based on conversations he had with Pauline.

## F. Jury Instructions and Verdicts

¶36        The jury was instructed on contract and joint venture law. During deliberations, the jury returned with a question: "It's our understanding that the bylaws are in conflict with the articles. We wanted to know if the members of Absolute have the power to control the makeup of the board of directors for Absolute Healthcare." The court and counsel engaged in a lengthy discussion, with the Henrys' counsel stating, "there are no members and assuming, I guess, that they want to claim people are members, then I think the members -- yes, the members could then vote the board of directors. I think we're all in agreement on that. I think that's the only way you can answer it." Upon which the court instructed the jury "if the jury determines that there are members of Absolute [Healthcare], those members would have the power to control the makeup of the board of directors for Absolute Healthcare."

¶37        Based on the evidence presented, the jury could reasonably conclude that the parties had an enforceable agreement, through written documentation, words, and actions, to form a joint venture partnership to operate a medical marijuana business. *See In re Estate of Reinen v. N. Ariz. Orthopedics, Ltd.*, 198 Ariz. 283, 287, ¶ 12 (2000) ("The credibility of a witness' testimony and the weight it should be given are issues particularly within the province of the jury.") (citation omitted). Because Absolute's Articles stated that it "shall have members," the jury properly found that the members of Absolute were Pauline, George, Mark, Tim, and Nolan, and that those members chose the directors. Thus, the superior court did not abuse its discretion in entering judgment in favor of RHH and denying the Henrys' motion for a new trial.

¶38        Nevertheless, the Henrys contend that because the first JV Agreement of February 2011 was signed by George and Mark only, it was invalid. Thus, because Absolute was formed before the second JV Agreement was signed by all the parties in February 2012, the JV Agreement is an "illegal attempt to circumvent the non-profit corporation act" by amending an existing entity by agreement, not by statute. The Henrys cite *Conn v. Bates*, 1 CA-CV 13-0737, 2015 WL 7454096, * 1, ¶ 1 (Ariz. App. Nov. 25, 2015) (mem. decision) and *Vortex Corp. v. Denkewicz*, 235 Ariz. 551 (App. 2014) for support. Their reliance is misplaced as both cases rely on the documents specific to those parties and are factually distinguishable from the situation here. *See Conn*, 1 CA-CV 13-0737, at * 1, ¶¶ 1-2 (LLC created before parties met or had any type of relationship — new membership interest must be added pursuant to operating agreement of LLC created before new employee was hired); *Vortex*, 235 Ariz. at 554, ¶¶

4-5 (LLC created before parties met or had any type of relationship — terminated employees seeking additional stock interest under LLC's operating agreement).

¶39 Here, the JV Agreement, Articles, and words and conduct of the parties control. The jury was instructed, and the relevant case law holds, that the parties' agreement to enter a joint venture together need not be written. *See Owens*, 218 Ariz. at 226, ¶¶ 15-16. Meaning, the jury could, and apparently did, conclude that the parties agreed to enter into a joint venture together in early 2011 through their actions, notwithstanding that the original draft of the JV Agreement was not signed by all parties. Substantial evidence in the record supports the jury's verdicts.

## III. Sharing of Profits and Losses

¶40 The Henrys argue the superior court erred in denying their motion for judgment as a matter of law ("JMOL") and motion for a new trial because there can be no joint venture (which requires sharing of profits and losses) of Absolute because, by its very nature, the parties cannot share profits of a non-profit, and no evidence produced at trial proved the parties agreed to share losses. We disagree.

¶41 We review whether the superior court should have granted a JMOL motion *de novo*. *A Tumbling-T Ranches v. Flood Control Dist. of Maricopa Cnty.*, 222 Ariz. 515, 524, ¶ 14 (App. 2009). A JMOL motion should be granted "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Id*. (citation omitted).

¶42 At the close of a party's case-in-chief, if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party . . . the court may . . . grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." Ariz. R. Civ. P. ("Rule") 50(a). Under Rule 50(b), if the court denies a party's Rule 50(a) motion and the case is submitted to the jury, that party may renew its motion and request that the court decide the legal questions raised in the initial motion.

¶43 The Henrys made an oral JMOL motion at the close of RHH's case-in-chief. They argued only that RHH had failed to prove that the parties agreed to share losses as required for a joint venture — a narrow

issue. After substantial argument and taking the matter under advisement, the superior court denied the motion.

¶44        To establish a joint venture, there must exist, among other things, participation in both profits and losses. *Ellingson*, 22 Ariz. App. at 386. "The term 'losses' is not limited to monetary losses, but includes time expenditures and out-of-pocket expenses[.]" *Id.* The parties' JV Agreement stated, "[e]ach person will contribute equal amounts of money for all start up expenses," and that "an accounting will be presented exhibiting . . . all expenses paid out to date for the business."

¶45        Evidence at trial showed that all parties, including Tim, Mark, and Nolan, had significant losses throughout this endeavor. Tim testified that without compensation, he met with the zoning authorities in Gilbert and Wellton, retained an architect to create plans for submission to both cities for approval, obtained permits for construction, and oversaw inspection and construction. Mark testified that without pay, he oversaw and maintained the real property leases, worked with the landlords, worked on construction issues, met with the city managers, and by October 2011 had invested approximately $140,000. Nolan testified that also without pay, he designed the cultivation facility and dispensaries, worked with the architects and engineers, and trained employees. And, as evidenced by the promissory notes, the group loaned the business significant sums of money — Mark was owed $150,000, Nolan was owed $500,000, Tim was owed $150,000, and Pauline was owed $300,000.

¶46        As for the sharing of profits, the Henrys argue that there can be no joint venture of Absolute because the parties cannot share profits of a non-profit. The Henrys, however, fail to cite any authority for the proposition that the parties cannot agree to share profits from another entity that is part of the same joint venture, such as PNTM. The JV Agreement stated that "[e]ach person will have equal shares in the business, (33 1/3%), and all profits, mon[ies], etc., will always be distributed equally." Evidence at trial showed that the group understood that the for-profit entity PNTM would own all the assets, and profits would be distributed from PNTM. Pauline stated that "[a]ll the assets are going to belong to the Management Company as I understand it[.]"

¶47        For the forgoing reasons, the superior court did not err in denying the Henrys' JMOL motion.

## IV.    Attorneys' Fees

**¶48**        The Henrys argue the superior court erred in granting RHH's attorneys' fees under A.R.S. § 12-341.01.  Specifically, the Henrys contend that none of RHH's claims nor their own counterclaims arise out of contract, the amount of fees requested was unreasonable, and the court awarded the entire requested amount without explanation.

**¶49**        We review the application of § 12-341.01 *de novo* and the amount of an award of attorneys' fees for an abuse of discretion.  *Dooley v. O'Brien*, 226 Ariz. 149, 152, ¶ 9 (App. 2010).  "In any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney fees."  A.R.S. § 12-341.01(A).  The stated public policy behind awarding fees under § 12-341.01(A) is "to mitigate the burden of the expense of litigation to establish a just claim or a just defense."  A.R.S. § 12-341.01(B).  In determining whether the claim is one "arising out of a contract," we look to the nature of the action and the surrounding circumstances, regardless of the form of the pleadings.  *Marcus v. Fox*, 150 Ariz. 333, 335 (1986); *see also Rudinsky v. Harris*, 231 Ariz. 95, 101, ¶ 27 (App. 2012) (action considered to have arisen out of contract when plaintiff asserts a contract); *Associated Indem. Corp. v. Warner*, 143 Ariz. 585, 589 (App. 1983) (declaratory judgment action is action arising out of contract within the meaning of A.R.S. § 12-341.01) *mod. on other grounds*, 143 Ariz. 567 (1985); *Nationwide Mut. Ins. Co. v. Granillo*, 117 Ariz. 389, 394 (App. 1977) (fees awarded for declaratory judgment action under A.R.S. § 12-341.01).

**¶50**        This action arose out of a controversy between RHH and the Henrys as to the meaning of the parties' agreements.  In their complaint, RHH sought a determination of their rights, status, and legal relationship to the effect that the parties agreed they would be members and directors of Absolute — a contract.  Specifically, RHH alleged the Henrys "promised" that RHH would be members of Absolute, further "promised" to put that in writing, and the Henrys "breached their promises."  Thus, RHH brought this action to adjudicate facts and law regarding the parties' JV agreement, words, and conduct throughout this endeavor.  In RHH's motions for summary judgment, they confirmed they sought declaratory judgment under the "writings constituting a contract," including the JV Agreement, that "it was agreed that [RHH] would be on Absolute's board[.]"

**¶51**        The Henrys contend none of their counterclaims arose out of contract.  They counterclaimed for (1) declaratory judgment regarding the control of Absolute and PNTM, (2) accounting of Absolute and PNTM, (3) breach of fiduciary duty, (4) fraud, (5) unjust enrichment, (6) conversion, (7)

aiding and abetting, (8) consumer fraud, (9) securities fraud, and (10) conspiracy. In their counterclaim, the Henrys sued not only Mark, Tim, and Nolan, but also Mark's company, Mark's daughter (Devon), and Tim's wife (Michelle) for the various torts listed. From January 2015 to May 2015, the parties filed at least 23 motions and cross motions for summary judgment, responses, and replies on the Henrys' counterclaims. During the summary judgment proceedings, RHH continuously claimed the parties had a contract. For example, RHH alleged that the Henrys' counterclaim for unjust enrichment cannot be maintained where the parties have a contract, and here, "there is and always has been a contractual relationship between [RHH] and the Henrys[.]" At oral argument in May 2015 on the summary judgment motions, the parties stipulated to dismiss counts 4-10 of the Henrys' counterclaims. They also agreed that RHH "will be the prevailing parties on the counterclaims after the dismissal and the [Henrys] agree that [RHH] may apply for attorneys' fees, costs, and sanctions and the Court may consider those issues." Of note, the record on appeal includes only the minute entry of the oral argument, not the transcript. Because the Henrys failed to provide a copy of the transcript, we presume it supports the court's subsequent grant of attorneys' fees to RHH based on the parties' stipulation. *See In re Mustonen's Estate*, 130 Ariz. 283, 284 (App. 1981); ARCAP 11 (a party is responsible for making certain the record on appeal contains all transcripts or other documents necessary for us to consider the issues raised on appeal).

¶52 The only remaining claim and counterclaim for trial were mirror images of declaratory judgment relief as to the members and directors and control of Absolute. The Henrys' breach of fiduciary duty claim had been previously dismissed and the parties agreed that both claims for an accounting were moot.

¶53 The joint pretrial statement and statement of the case, which was read to the jury, reiterated and verified that this case was a contract dispute. RHH alleged that they and the Henrys "entered into a joint venture agreement to operate [] medical marijuana dispensaries and cultivation facilities in Arizona, including one called Absolute Healthcare." And they alleged "according to the parties' joint venture agreements," Pauline and RHH would be members and directors of Absolute. Whereas, the Henrys alleged that "there is no enforceable agreement for them to be members and directors of Absolute[.]"

¶54 The Henrys argue that because RHH did not request attorneys' fees in their complaint, they are precluded from receiving them. We disagree. A claim for attorneys' fees must be made in the pleadings,

which includes an answer to a counterclaim. *See* Ariz. R. Civ. P. 54(g)(1) ("A claim for attorney's fees must be made in the pleadings."); Ariz. R. Civ. P. 7(a) (answer to a counterclaim is a "pleading"). In RHH's answer to the Henrys' counterclaims, they requested attorneys' fees pursuant to § 12-341.01. In fact, despite the Henrys' assertion that none of RHH's claims nor their own counterclaims arise out of contract under § 12-341.01, in their answer and counterclaim, they too requested attorneys' fees under § 12-341.01 "resulting from and incurred as a result of defendants' breach and other wrongful actions[.]" Moreover, the pretrial statement stipulated this was a dispute whether there was an enforceable agreement, controlling the subsequent litigation and amending the pleadings. *See Carlton v. Emhardt*, 138 Ariz. 353, 355 (1983) ("The pretrial statement controls the subsequent course of the litigation . . . ha[ving] the effect of amending the pleading[.]") (internal citations omitted).

**¶55** By the conclusion of trial, RHH was the successful party on all claims and counterclaims, either by jury verdict, stipulation to dismiss with an express agreement that RHH could seek attorneys' fees, or order of the court. Considering the nature of the action, surrounding circumstances, and evidence produced at trial, this case arose out of contract, whether express or implied. The superior court properly applied § 12-341.01 in awarding RHH's attorneys' fees.

**¶56** The Henrys also argue the amount of fees requested was unreasonable and the court abused its discretion by awarding the entire requested amount without explanation. The Henrys, however, fail to cite any authority or develop any argument why the award of $651,454.51, plus interest, was unreasonable or the court was required to explain its reasoning. Thus, we deem such arguments waived and do not address them. *See City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, 195, ¶ 88 (App. 2008) (noting that an appellate court will not address issues or arguments waived by party's failure to develop them adequately); *see also* ARCAP 13(a)(7)(A) (stating that the opening brief must include an "[a]ppellant's contentions concerning each issue presented for review, with supporting reasons for each contention, and with citations of legal authorities and appropriate references to the portions of the record on which the appellant relies").

## CONCLUSION

¶**57**      For the foregoing reasons, we affirm the superior court's judgment in favor of RHH. RHH requests attorneys' fees and costs on appeal under A.R.S. §§ 12-341, -341.01, and -342. In the exercise of our discretion, and based upon our determinations above, because RHH is the successful party on appeal, we award them a reasonable amount of attorneys' fees and costs incurred on appeal upon compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED: AA